**Ex parte Charles Dean HOOD, Applicant.**

No. AP–75370.

Court of Criminal Appeals of Texas.

Jan. 10, 2007.

A. Richard Ellis, Mill Valley, CA, Gregory W. Wiercioch, San Francisco, CA, for Appellant.

Jeffrey Garon, Asst. Crim. D.A., McKinney, Matthew Paul, State's Attorney, Austin, for State.

KELLER, P.J., delivered the opinion of the Court in which MEYERS, PRICE, KEASLER, and HERVEY, JJ., joined.

This is applicant's third habeas application, and the claim he presents now was presented in neither of the first two applications. One of the questions before us is whether we are barred from considering the merits of this application under statutory subsequent application provisions. We conclude that we are barred from considering the merits because the legal bases upon which applicant relies were available at the time he filed his second application.

## I. BACKGROUND

On September 7, 1990, applicant was convicted of capital murder. During the punishment phase of trial, he presented mitigating evidence that he now contends was not adequately encompassed by the jury instructions. This included evidence that he was run over by a truck at the age of three, that he received beatings during and after school (including a blow to the head from a metal pipe), and that he suffered from speech defects and learning disabilities. Applicant's trial occurred after the United States Supreme Court handed down *Penry I*,[1] but before the Texas Legislature added the mitigation special issue to Article 37.071.[2] In response to *Penry I's* dictates, the trial court chose to use a "nullification" instruction to enable the jury to give effect to applicant's mitigating evidence. As in *Smith*,[3] the submitted nullification instruction was a "clear" instruction, specifically requiring jurors to answer at least one of the special issues "no"—even if "yes" answers to all

---

1. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

2. *See* Acts 1991, 72nd Leg., ch. 652, § 9 (adding mitigation special issue). All references to articles refer to the Texas Code of Criminal Procedure.

3. *See Ex parte Smith,* 132 S.W.3d 407, 416 (Tex.Crim.App.2004); *Smith v. Texas,* 543 U.S. 37, 46–48, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004).

the special issues had been established beyond a reasonable doubt—if they believed that the defendant's mitigating evidence justified a sentence of life rather than death. The jury answered all of the special issues "yes," and, in accordance with the jury verdict, the trial court entered a judgment sentencing applicant to death.

We affirmed the trial court's judgment on direct appeal.[4] In his brief on appeal, applicant raised a point of error complaining that the trial court erred "in failing to instruct the jury of a method to be used by them to give effect to mitigating evidence."[5] He argued that the charge that was given failed to satisfy *Penry I's* requirements.[6] Although we found the point to be inadequately briefed, we nevertheless proceeded to the merits.[7] After reviewing the jury charge, we concluded that the nullification instruction "did provide the jury with an adequate vehicle to express *and give effect* to its 'reasoned moral response'" to applicant's mitigating evidence.[8]

On December 22, 1997, applicant filed his first application for writ of habeas corpus. As originally filed, that application included a challenge to the nullification instruction, but the application was subse-

quently amended, and that particular claim was omitted. We denied the application on April 21, 1999.[9]

On June 4, 2001, the United States Supreme Court decided *Penry II*, holding that the "ambiguous" nullification instruction submitted in that case failed to afford the jury an adequate vehicle by which to consider the proffered mitigating evidence of mental retardation.[10] On April 21, 2004, this Court decided *Ex parte Smith* (*Smith I*), which made two significant holdings: (1) adopting the Fifth Circuit's "constitutional relevance" threshold requirement, which called for a showing that "the defendant's criminal act was due to uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own," and (2) distinguishing the "clear" nullification instruction in *Smith* from the "ambiguous" instruction found to be inadequate by the Supreme Court in *Penry II*.[11]

On May 24, 2004, applicant filed, *pro se,* his second habeas corpus application, which alleged that he was actually innocent of the crime for which he was convicted.[12] We later dismissed that application as an abuse of the writ under Article 11.071, § 5.[13]

**4.** *See Hood v. State,* No. 71,167 (Tex.Crim. App., Nov. 24, 1993)(not designated for publication).

**5.** *Id.,* slip op. at 18 (quoting applicant's brief).

**6.** *Hood,* slip op. at 18–19.

**7.** *Id.* at 19.

**8.** *Id.* at 20 (emphasis in original).

**9.** *Ex parte Hood,* No. 41,168–01 (Tex.Crim. App., Apr. 21, 1999)(not designated for publication).

**10.** *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

**11.** *Ex parte Smith,* 132 S.W.3d 407, 413–416, 416–417 (Tex.Crim.App.), *rev'd sub. nom., Smith v. Texas,* 543 U.S. 37, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004)(internal quotation marks omitted).

**12.** In this second application, applicant indicated that he was being represented by counsel in federal court and with respect to state DNA proceedings but that counsel had refused to file a subsequent state application raising the actual innocence claim.

**13.** *Ex parte Hood,* No. WR–41,168–02, 2005 WL 914225 (Tex.Crim.App., Apr. 13, 2005)(not designated for publication).

On June 24, 2004, the Supreme Court decided *Tennard v. Dretke,* discarding the Fifth Circuit's "constitutional relevance" threshold requirement.[14] On November 15, 2004, the Supreme Court reversed our decision in *Smith I* with its decision in *Smith II.*[15] The Court overturned our first holding as inconsistent with *Tennard,* and it overturned our second holding on the basis that the "clear" nullification instruction (and thus *any* nullification instruction) was governed by its holding in *Penry II.*[16]

On June 22, 2005, eight days before his scheduled execution, applicant filed a third habeas corpus application, along with a motion for stay of execution. That application is the one currently before us, and it advanced a single claim for relief: "The nullification instruction in Mr. Hood's case suffers from the same defects that the Supreme Court found unconstitutional in *Penry II* and [*Smith II* ]." Applicant alleged compliance with the subsequent application requirements of Article 11.071, § 5, and we initially accepted that allegation—staying the execution and remanding the case to the trial court for further proceedings.[17] After proceedings in the trial court, the record was returned to us, and we ordered the parties to brief "the merits of this issue in light of the entire charge that the jury received, harm under *Almanza v. State,* 686 S.W.2d 157 (Tex.Crim.App. 1985) (op. on reh'g), and whether the issue should have been raised in either the first or second applications."[18]

With regard to the third question, applicant contends that the Supreme Court's repudiation in *Tennard* and *Smith II* of the Fifth Circuit's "constitutional relevance" threshold requirement constitutes a new legal basis for his claim. He argues that this Court used the Fifth Circuit's threshold requirement as a screening test that prevented ever reaching the merits of a *Penry* claim (whether based on *Penry I* alone or a combination of *Penry I and II* ). He further argues that two of our unpublished dispositions evince a recognition that *Tennard* and *Smith II* supplied a new legal basis for reviewing a *Penry II* claim. He points first to our unpublished opinion in *Robertson,* which explicitly referenced *Tennard* and *Smith II,* in concluding that the legal basis for his claim was unavailable at the time his previous applications were filed.[19] Applicant points next to our unpublished, 2002 order in *Ex parte Davis,* which dismissed a *Penry II* application as an abuse of the writ,[20] as evidence of how this Court reacted to *Penry II* applications before *Tennard* and *Smith II* were decided.

The State contends that applicant's claim became available when *Penry I* was decided, and thus, should have been presented in applicant's first application. The State points out that applicant *did* present the claim initially in that application before withdrawing it. Alternatively, the State contends that the legal basis for applicant's claim became available when *Penry*

**14.** 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

**15.** *Smith v. Texas,* 543 U.S. 37, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004).

**16.** *Smith II, supra.*

**17.** *Ex parte Hood,* No. WR–41,168–03 (Tex. Crim.App., Jun. 27, 2005)(not designated for publication).

**18.** *Ex parte Hood,* No. WR–41,168–03 (Tex. Crim.App., Apr. 5, 2006)(not designated for publication).

**19.** *See Ex parte Robertson,* No. AP–74,720 (Tex.Crim.App., Mar. 16, 2005).

**20.** *See Ex parte Davis,* No. WR–40,339–03 (Tex.Crim.App., Apr. 29, 2002).

*II* was decided, and thus, should have been presented in applicant's second application. The State disputes applicant's allegation that *Tennard* and *Smith II* afforded a new legal basis for applicant's claim.

## II. ANALYSIS

### A. Statutory Construction

 In this case, determining whether the current claim should have been raised in an earlier application requires that we construe the capital habeas statute's subsequent application provision, Article 11.071, § 5. When interpreting a statute, we follow our cardinal rule of construction: we must give effect to the plain meaning of the statutory text, unless the language is ambiguous or the plain meaning leads to absurd results that the Legislature could not possibly have intended.[21] In determining the plain meaning of the text, we read words and phrases in context and construe them in accordance with "the rules of grammar and usage."[22] In addition, "we generally presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible."[23]

 We must first determine whether we can address the "subsequent application" issue after remanding the case to the trial court for further proceedings. The capital habeas statute requires the trial court to forward any subsequent application to this Court before taking any other action with respect to that application so that this Court may determine whether the subsequent application provisions have been met.[24] This Court is then required either to issue an order finding that the requirements have been satisfied (in which event, the case is remanded to the trial court for further proceedings) or to dismiss the application.[25] But the statute also provides that "a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that" one of three statutory exceptions has been satisfied.[26] Plainly, we are a "court" within the meaning of the statute, and thus, we are not at liberty to ignore the legislative prohibition against considering the merits of a claim that does not meet the subsequent application requirements. If we determine that those requirements are not met, we must dismiss the application, even if we had previously remanded the claim on the basis of an initial determination that the requirements had in fact been met. We therefore proceed to determine whether a relevant exception to the subsequent application prohibition has been satisfied.

We need not concern ourselves with two of those exceptions: applicant's claim does not affect his guilt, so the "innocence gateway" exception does not apply,[27] and applicant's claim, if accepted, would not establish that "no rational juror would have answered in the State's favor one or more of the special issues" submitted to the jury, even if we include, as one of those special issues, the mitigation special issue

---

21. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim.App.1991).

22. *Sanchez v. State*, 995 S.W.2d 677, 683 (Tex.Crim.App.1999); TEX. GOV'T CODE § 311.011(a).

23. *Whitelaw v. State*, 29 S.W.3d 129, 131 (Tex.Crim.App.2000).

24. Art. 11.071, § 5(c).

25. *Id.*

26. Art. 11.071, § 5(a).

27. *See* Art. 11.071, § 5(a)(2).

now required to be submitted by statute.[28] At best, applicant's claim would establish that the jury might have answered a special issue differently, not that it would have done so.

What remains is the "unavailability exception," which permits a subsequent application if:

> the current claims and issues have *not* been and could *not* have been presented previously in a timely initial application *or* in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application.[29]

This passage is marked by two adverbial prepositional phrases, "in a timely initial application" and "in a previously considered application," that are introduced by "not" and separated by "or." This "not ... or" phrasal structure is the equivalent of "nor," and indicates negation of both elements in the series.[30] Consequently, the exception requires that the claim in question be unavailable not only for the first habeas application but *also* for any "previously considered application."

Because applicant's second application was dismissed as subsequent under § 5, the question arises whether an application so dismissed qualifies as a "previously *considered* application." The body of § 5(a) provides that "a court may not *consider the merits* or grant relief based on a subsequent application."[31] Thus, a form of the word "consider" appears both in the body of § 5(a) setting forth the general prohibition and in the subsection (1) exception to that prohibition, but in the former instance, the word "consider" is given a direct object, "the merits," while in the latter instance, the word "considered" is not so modified. Use of "the merits" as a direct object for "consider" indicates that the Legislature recognized there were other types of "consideration," while the absence of that direct object in subsection (1) indicates that the Legislature did indeed intend the word "considered" to have a broader meaning in that subsection.[32] If the statutory text were taken to be ambiguous on that count, however, the clearly expressed intent in the legislative history to limit applicants to "one bite at the apple"[33] supports the conclusion that an applicant must show that a claim was unavailable even for applications that were dismissed under § 5.[34] Otherwise, once an initial application had been filed and the time for that initial filing had run, the statutory disincentive to filing piecemeal litigation would dissipate. As we have observed elsewhere, "[I]f [a] habeas petition-

---

**28.** *See* Art. 11.071, § 5(a)(3).

**29.** Art. 11.071, § 5(a)(1)(emphasis added).

**30.** *See* THE AMERICAN HERITAGE BOOK OF ENGLISH USAGE, pt. 1 (*Grammar*), § 40 (*nor*) (1996).

**31.** Art. 11.071, § 5(a)(emphasis added).

**32.** *See Ex parte Whiteside*, 12 S.W.3d 819, 821 (Tex.Crim.App.2000)("The Legislature modified 'initial application' with the phrase 'challenging the same conviction' but did not so modify 'subsequent application.' The lack of any language modifying 'subsequent application' plainly indicates the Legislature's intent that 'subsequent applications' include *all* subsequent habeas corpus applications regarding the same conviction, rather than only those that 'challenge' the conviction.")(emphasis in original).

**33.** *Ex parte Torres*, 943 S.W.2d 469, 474 (Tex.Crim.App.1997)(discussing legislative history common to the subsequent application provisions in both Arts. 11.07 and 11.071).

**34.** *Whiteside*, 12 S.W.3d at 821 ("Interpreting 'subsequent applications' under § 4 to include all applications for writs of habeas corpus regarding the same conviction would most effectively achieve the Legislature's objective.").

er has grounds which would justify granting relief, he should present them with dispatch for determination, rather than doling them out one-by-one in repeated attempts to have both the benefits of relief and the fleeting pleasures of harassing those who confine him."[35] Thus, to satisfy the exception, applicant's claim must have been unavailable as to *both* of his previous applications.

As our quotation of the text shows, the statute prescribes two different methods of demonstrating unavailability: (1) a new factual basis and (2) a new legal basis. We can quickly dispense with the first method: the facts underlying applicant's complaint about the jury instruction were known at trial, and therefore, those facts were necessarily available at the time the prior habeas applications were filed.[36]

▉ The second method of demonstrating unavailability—a new legal basis—requires more explanation. The Legislature specifically defined what constitutes an unavailable legal basis under § 5:

> For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was *not* recognized by or could *not* have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, *or* a court of appellate jurisdiction of this state on or before that date.[37]

Similar to the passage addressed above, this passage contains a "not . . . or" phrase, here marked by a series of noun phrases (describing the various types of courts) introduced by "not" and separated by "or." Consequently, the structure of the statutory provision requires that availability be negated for all the types of courts listed. For a legal basis to be unavailable, then, it must be true that no decision from any of these types of courts makes the claim available (either by explicit recognition or reasonable formulation). Stated another way, if the legal basis for the claim was recognized by or could have been reasonably formulated from a Supreme Court decision, any federal court of appeals decision, or any state appellate court decision, then the applicant has failed to meet the unavailability exception. It is not enough, for example, for an applicant to show that the legal basis could not have been derived from any Texas state court decision if there existed a federal appellate decision from which the legal basis could be derived.

Another point that deserves emphasis is that lack of recognition is not enough to render a legal basis unavailable. If the legal basis *could have been reasonably formulated* from a decision issued by a requisite court, then the exception is not met.

## B. First Application—Adequacy of the Nullification Instruction

Ultimately applicant's claim is grounded in *Penry I*. It is *Penry I* that requires that the jury be afforded an adequate vehicle for giving effect to mitigating evidence that cannot otherwise be given effect through the statutory special issues.[38] But applicant's claim is also grounded in *Penry II* and *Smith II* because he contends, as he must, that the submitted nullification

---

35. *Ex parte Kerr,* 64 S.W.3d 414, 418 n. 11 (Tex.Crim.App.2002)(citing *Ex parte Carr,* 511 S.W.2d 523, 525 (Tex.Crim.App.1974)).

36. *Ex parte Sowell,* 956 S.W.2d 39, 40 (Tex.Crim.App.1997)(trial court's statement that the defendant could not appeal did not constitute a new factual basis because it occurred at trial).

37. Art. 11.071, § 5(d)(emphasis added).

38. *See Penry I, supra.*

instruction was *not* an adequate vehicle for that purpose. *Penry I* did not specifically address the acceptability of a nullification instruction, so the legal basis for challenging that type of instruction was not "recognized" in *Penry I*. The more difficult question, however, is whether that legal basis could have been reasonably formulated from *Penry I* or from other caselaw from the relevant jurisdictions.

We need not address that question in the abstract, however, because we decided the acceptability of the nullification instruction in applicant's direct appeal. It is axiomatic that issues raised and rejected on direct appeal are generally not cognizable on habeas corpus.[39] An exception to that rule occurs when there is a change in a legal principle relevant to the applicant's claim, and that legal principle would apply retroactively to cases on habeas corpus.[40] But when there has been no change, an applicant should not be expected to again urge the exact same basis that we have already rejected. In the language of the statute, the legal basis for the claim "could not have been reasonably formulated" at the time the habeas application was filed because, on direct appeal, we had specifically rejected it, and no change in the law had occurred with respect to the issue addressed. Not only is this interpretation supported by the language of the statute, but it serves judicial economy and conforms to common sense: issues that can be litigated on direct appeal, should be litigated there, and not re-litigated on ha-

beas corpus. The same kind of reasoning applies when a claim is litigated in a prior habeas application and the law has not changed with respect to that claim at the time a subsequent application is filed. After all, § 5 bars claims and issues that *have been* presented in an earlier application, not just claims and issues that *could have been presented.*[41] If we decide an issue adversely to a defendant in a way that contradicts a later legal development, that later legal development constitutes a legal basis that was not presented and could not have been presented at the time.

To summarize: a legal basis is unavailable if it has been exhausted by previous presentation to this Court, but that legal basis can become newly available as a result of later, binding precedent relevant to the issue in question. There are some important distinctions between this "unavailability by exhaustion" doctrine and other situations that practitioners must keep in mind. First, a decision in *someone else's* case cannot qualify as exhaustion. Exhaustion is based on cognizability, which depends on what the *applicant* has done to advance his claims. Also, a "change in the law" under the exhaustion doctrine, rendering an issue newly cognizable (and thus "available"), must come from a binding authority, i.e. cases from this Court and the United States Supreme Court. If a legal basis has been exhausted, intermediate federal and state appellate court decisions cannot render that legal basis newly cognizable.[42] As we have recognized

39. *Ex parte McFarland,* 163 S.W.3d 743, 748 (Tex.Crim.App.2005).

40. *Id.; Ex parte Drake,* 883 S.W.2d 213, 215 (Tex.Crim.App.1994).

41. Art. 11.071, § 5(a)(1)("the current claims and issues have not been and could not have been presented previously").

42. Non-cognizability due to exhaustion is an entirely different situation from non-cognizability due to a failure to exhaust. That is, the failure to raise on appeal an issue that should have been raised would render the issue non-cognizable on habeas corpus, but such a failure itself implicates questions of procedural default, and is not a matter addressed in the present opinion. *See Ex parte Gardner,* 959

above (and will discuss more below), however, the rule is different for issues that are not exhausted.

■ Applying the "unavailability by exhaustion" doctrine to applicant's case, we find that applicant's subsidiary claim regarding the efficacy of the nullification instruction had already been exhausted at the time he filed his first application. We decided on the direct appeal of this case that the nullification instruction was constitutionally adequate to give effect to any mitigating evidence offered by the defendant. Between the direct appeal and the habeas application, no relevant change in the law occurred regarding that issue. *Penry I* had already been the law on direct appeal, and *Penry II* (as well as *Smith II*) had not yet been decided. We conclude that the particular legal basis being discussed here—the inadequacy of the nullification instruction—was unavailable at the time applicant filed his *first* writ application. Therefore he was not required to rely on that legal basis in his first application. The next question is whether it was unavailable at the time he filed his *second* application.

### C. Second Application

#### 1. *Adequacy of the Nullification Instruction*

■ Notably, applicant does not contend that *Smith II's* nullification holding constituted a legal basis that was unavailable at the time he filed his *second* application, but we address that issue nonetheless. Obviously, *Penry II* was an available legal basis with regard to the *second* application because *Penry II* was decided nearly three years before the second application was filed. The question becomes whether *Smith II's* clarification of *Penry*

*II* constitutes an unavailable legal basis upon which applicant can now rely. The only relevant distinction between the two cases is that *Penry II* involved an ambiguous instruction while *Smith* involved a clear nullification instruction. While the *Penry II* Court did criticize the instruction submitted in that case as ambiguous, some of the Court's discussion suggested that nullification instructions might be inherently problematic:

> Here, however, it would have been both logically and ethically impossible for a juror to follow both sets of instructions. Because Penry's mitigating evidence did not fit within the scope of the special issues, answering those issues in the manner prescribed on the verdict form necessarily meant ignoring the command of the supplemental instruction. And answering the special issues in the mode prescribed by the supplemental instruction necessarily meant ignoring the verdict form instructions. Indeed, jurors who wanted to answer one of the special issues falsely to give effect to the mitigating evidence would have had to violate their oath to render a true verdict. The mechanism created by the supplemental instruction thus inserted "an element of capriciousness" into the sentencing decision, "making the jurors' power to avoid the death penalty dependent on their willingness" to elevate the supplemental instruction over the verdict form instructions.[43]

Although one could certainly argue (as we did in *Smith I*) that a clear nullification instruction would present a distinguishable situation, satisfying the Supreme Court's cited ethical concerns by removing any doubt regarding "which instruction should

---

S.W.2d 189, 198–199 (Tex.Crim.App. 1998)(op. on reh'g).

**43.** *Penry II*, 532 U.S. at 799–800, 121 S.Ct. 1910 (citation omitted).

control over the other one," [44] this passage in *Penry II* certainly afforded the opportunity to "reasonably formulate" a legal argument for the proposition that any nullification instruction would be inadequate. In fact, the Supreme Court in *Smith II* specifically found that *Penry II* had "identified a broad and intractable problem ... inherent in *any* requirement that the jury nullify special issues contained within a verdict form." [45] And because *Penry II* was a new legal development from a binding authority that was relevant to the nullification claim applicant had advanced on direct appeal, after *Penry II*, applicant's nullification issue became cognizable on habeas corpus, and thus "available."

Of course, we held in *Smith I* that *Penry II* was distinguishable, rejecting a constitutional challenge to a "clear" nullification instruction. But our holding in *Smith I* could have no effect on federal precedent. Under the plain language of § 5, *Penry II*—a Supreme Court decision—continued to afford a basis for challenging any nullification instruction. As a *general* matter, that state of affairs could be changed only by a decision of the United States Supreme Court.

A particular applicant, however, could render the *Penry II* legal basis unavailable by *exhausting* it. That is, applicant could have raised the *Penry II* claim in his second application, and if that claim were rejected (on the merits or as a result of a § 5 dismissal),[46] applicant would then have been able to raise the claim in a subsequent application after the Supreme Court's decision in *Smith II*.[47] But applicant failed to do so, and thus, he cannot proffer *Smith II's* holding on the nullification instruction as one that was previously unavailable at the time he filed the second application.

### 2. Threshold Requirement

■■ We turn finally to the allegation that the Supreme Court's decisions in *Tennard* and *Smith II* provided a new legal basis for applicant's claim by eliminating the threshold requirement originally imposed by the Fifth Circuit and subsequently adopted by this Court. Although the Fifth Circuit had adhered to its threshold test for over a decade,[48] this test was never adopted in a Supreme Court opinion. In the meantime, *Penry I* stood as a Supreme Court decision from which an applicant could "reasonably formulate" the contention that he was entitled to jury consideration of *any* type of mitigating evidence.[49]

44. *Smith I*, 132 S.W.3d at 416.

45. *Smith*, 543 U.S. at 46, 125 S.Ct. 400 (emphasis added).

46. *See Ex parte Staley*, 160 S.W.3d 56, 63–64 (Tex.Crim.App.2005)(claim can be dismissed under § 5 if Court determines, substantively, that defendant's allegations do not fall within the umbrella of the new legal claim).

47. In fact, had applicant raised the nullification claim in his second application, he would likely have received consideration in *that* application since we disposed of his application after *Smith II* had been decided.

48. *See Smith*, 132 S.W.3d at 413, 413 n. 19 (citing *Graham v. Collins*, 950 F.2d 1009, 1029 (5th Cir.1992)(en banc), *aff'd*, 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993)).

49. *Penry I*, 492 U.S. at 315, 109 S.Ct. 2934 (special issues should be "interpreted broadly enough to permit the sentencer to consider all of the relevant mitigating evidence a defendant might present in imposing sentence," citing *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)), 317, 109 S.Ct. 2934 (sentencer "should not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," citing plurality opinion in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)), 318, 109

The Supreme Court's *Tennard* opinion recognized that a previous (1990) decision addressing "the relevance standard applicable to mitigating evidence in capital cases ... spoke in the most expansive terms." [50] In fact, the Supreme Court repudiated the Fifth Circuit's test as one that "has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context." [51] In similar, strongly worded language, the Supreme Court in *Smith II* rejected the Fifth Circuit's approach (and ours) as "a test we have never countenanced and now have unequivocally rejected." [52] The Supreme Court observed that its broad interpretation of mitigating evidence was not new, having been "plain under our precedents" dating back to 1982.[53]

 As we stated earlier, this Court's decisions cannot affect the availability of legal bases articulated in federal court opinions. Regardless of our decision in *Smith I*, or in our earlier cases, *Penry I* afforded a legal basis for contending that the defendant's mitigating evidence was constitutionally relevant to determining whether he should receive the death penalty. Applicant was not required to raise that constitutional relevance issue in his first application because our nullification holding on direct appeal necessarily rendered any *Penry*-based claim non-cognizable.[54] But once that bar to cognizability was erased (by *Penry II*), applicant was no longer excused from raising the issue. Because we did not resolve the constitutional relevance issue in applicant's direct appeal, the issue had not been exhausted, and thus, applicant was required to raise it in his second application. He did not.

 Applicant's reliance on our post-*Penry II* dismissal of a habeas application in *Davis*, as evidence that he could not have raised a *Penry II* claim earlier, is unavailing. For starters, *Davis* was an unpublished disposition, and as such, has no precedential value. In any event, as discussed above, dispositions by this Court, whether published or unpublished, cannot render unavailable a legal basis made available by a federal appellate decision except as to the particular applicant in question. Essentially, each applicant must "fight his own battles" until the Supreme Court decides to step in and clarify matters one way or the other.

Finally, we find unavailing applicant's reliance on the remand in *Robertson* for the proposition that he is advancing a previously unavailable claim. As with *Davis*, *Robertson* is an unpublished disposition, without precedential value. Moreover, our remand opinion in *Robertson* was handed down before we filed and set the issues in the present case. We had originally remanded the application in the present case as well, but have since decided that the subsequent application issue should be

S.Ct. 2934 (sentencer may not be precluded from considering "any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death," citing *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)).

50. 542 U.S. at 284, 124 S.Ct. 2562 (citing *McKoy v. North Carolina*, 494 U.S. 433, 440–441, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990)).

51. *Id.*

52. 543 U.S. at 45, 125 S.Ct. 400.

53. *Id.* (citing *Penry I, Payne v. Tennessee*, 501 U.S. 808, 822, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), *Boyde v. California*, 494 U.S. 370, 377–378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), and *Eddings* (1982)).

54. *See Staley*, cited above (applicant's claim must fall within umbrella of new legal theory to warrant consideration).

briefed and addressed. Finally, *Robertson* is distinguishable because the applicant in that case challenged the nullification issue at every opportunity: on direct appeal,[55] in his initial habeas application (filed in 1997), and in his second habeas application, producing the remand opinion upon which applicant now relies.[56]

## D. Conclusion

Applicant was excused from presenting a *Penry*-type claim in his *first* application because we held on his direct appeal that the nullification instruction was adequate. That holding was sufficient to defeat a claim for relief, and binding precedent suggesting the incorrectness of that holding (i.e. *Penry II*) did not yet exist. But applicant was not excused from presenting this claim in his *second* application because it was filed after *Penry II,* which afforded a new basis to challenge our previous holding. *Smith II* did not supply a previously unavailable legal basis for challenging our original nullification holding because that basis had already been supplied by *Penry II,* and, even though applicant had the opportunity to litigate *Penry II* in his second application, he did not do so and thus received no adverse ruling from this Court holding *Penry II* inapplicable. Further, the Supreme Court's repudiation of the Fifth Circuit's "constitutional relevance" threshold requirement in *Tennard* and *Smith II* does not, in the abstract, constitute a previously unavailable legal basis for

relief because, according to the Supreme Court itself, that basis could have been reasonably formulated from the Supreme Court's prior decision in *Penry I* and other previously available Supreme Court caselaw. And finally, the *Tennard/Smith II* constitutional relevance holding has not been made unavailable by exhaustion because this Court has not previously addressed the issue with respect to applicant and applicant had the opportunity to raise the issue in his second application but failed to do so.

Accordingly, we hold that the current application is barred as a subsequent application under Article 11.071, § 5. The application is dismissed.

COCHRAN, J., filed a dissenting opinion, in which WOMACK, JOHNSON, and HOLCOMB, JJ., joined.

COCHRAN, J., dissenting, in which WOMACK, JOHNSON, and HOLCOMB, JJ., joined.

I respectfully dissent.

We filed and set this subsequent application for a writ of habeas corpus in a death penalty case to decide, among other things, whether applicant could have raised his "nullification instruction" claim in his earlier habeas applications. I conclude that no Texas or federal court had recognized the legal basis for his claim until the Supreme

---

55. *Robertson v. State,* 871 S.W.2d 701, 710–711 (Tex.Crim.App.1993), *cert. denied,* 513 U.S. 853, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994).

56. *See Robertson,* No. AP–74,720. After *Robertson,* we remanded a sixth habeas application filed by Davis, which presented a *Penry II* nullification claim. *Ex parte Davis,* No. WR–40,339–06 (Mar. 29, 2006)(not designated for publication). As in *Robertson,* we cited *Tennard* and *Smith II. See Davis,* No. WR–40,-

339–06. The *Davis* remand order also occurred before we filed and set the issues in the present case, and Davis's situation contains two significant distinguishing factors: (1) he did *not* raise any sort of *Penry* claim on direct appeal, *see Davis v. State,* 961 S.W.2d 156 (Tex.Crim.App.1998), and (2) he *did* raise a *Penry II* claim in his first post-*Penry II* application (his third application). We express no opinion at this juncture on whether Davis's claims are properly before us.

Court decided *Tennard v. Dretke.*[1] Therefore applicant's legal claim is newly available, and we should address the merits of his jury-charge claim under *Almanza v. State.*[2]

## I.

Applicant was convicted of capital murder in 1990 for killing his boss and his boss's girlfriend. The evidence showed that applicant's boss had allowed applicant to live in his home, but that applicant had carefully planned and executed the murders, stolen his boss's credit cards, pawned his ring, and forged his name on stolen business checks to cash them. During the punishment phase, the State offered significant evidence that applicant would constitute a continuing threat to society. This evidence included burglary of a school when a juvenile, theft and forgery convictions, assault on his 15–year–old girlfriend, rape of another 15–year–old girl, threats to a third young woman while he was in jail on this charge, and assault upon a fellow inmate. The State also offered expert testimony from a clinical psychologist and a forensic psychiatrist that applicant had an anti-social personality disorder with little chance of rehabilitation. He did not appear to have organic brain damage, but might have a learning disability.

During the defense case, applicant offered the testimony of three witnesses. His mother testified that, when applicant was three years old, a septic-tank truck backed over him, breaking his back and legs. He was hospitalized for five months and had to wear a body cast. He could not walk for nearly two years. Applicant had a speech impediment—stuttering—and permanent hip damage. As a result of the accident, he had uneven legs. No school, medical, or psychological records or evaluations ever connected the truck injury to applicant's mental, emotional, or intellectual condition at the time of the murders or trial. According to his mother, applicant never liked school and frequently skipped classes, although his siblings had no such problems. By the time he should have been in ninth grade, he had already repeated two grades and then refused to attend any more classes. He tried to enlist in the Army but could not pass the entry exam even though he had an IQ of 89. Applicant was "the black sheep" of the family. Applicant called a second witness to say that he might have been accompanied by another person at the time he cashed his boss's stolen checks. His third defense witness testified that applicant told him (incorrectly) that his boss was really his father and that he never liked his boss's girlfriend.

Applicant's case was tried after the Supreme Court decided *Penry I*,[3] but before the Texas Legislature had convened to draft a statutory mitigation special issue to accommodate the *Penry I* holding.[4] Thus, the trial court submitted the two statutory

1. 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

2. 686 S.W.2d 157 (Tex.Crim.App.1985).

3. *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

4. *See Ex parte Staley*, 160 S.W.3d 56, 58 (Tex. Crim.App.2005). In *Staley*, this Court noted, The 1989 *Penry I* decision created a dilemma for Texas trial courts in capital-murder cases. As the Fifth Circuit has noted, Texas trial courts "could not craft entirely new jury interrogatories, as the precise questions had been written by the state legislature. Nor could they suspend the trials in anticipation of legislative remediation, as the legislature would not meet again until 1991 and its reaction was unknown." Thus, Texas state courts attempted to provide timely trials that complied with *Penry I* by drafting extra-statutory jury instructions or supplemental special issues until the Texas Legislature enacted a statutory mitigation special issue which went into effect on September 1, 1991.

special issues, but also included a special nullification · instruction discussing the manner in which the jury should account for mitigating evidence when answering those special issues.[5] Applicant's counsel did not object to the nullification instruction. He did, however, request additional instructions on the use of mitigating evidence [6] and asked that the jury be told to write the word "life" into the "yes" or "no" verdict forms if it should decide that the mitigating evidence called for such a sentence.[7] The trial judge noted that nothing in Texas law allowed the jury to answer the special issues with the word "life" and that the explicit wording and specific answers to the special issues were statutorily required. Therefore, the trial judge declined to give applicant's additional instruction.

During closing arguments, the defense stressed that, regardless of what the jury thought about the special issues, it could not forget to consider the mitigating evidence. Counsel emphasized applicant's youth, his poverty, and the trauma he had suffered when the truck ran over him as a three-year-old. He noted that at least one doctor thought he could have brain damage. The State reminded the jury that it bore the burden of proving the special issues, but the decision of whether mitigating circumstances existed was a decision solely for the jury to determine. The jury answered both Special Issues "yes," and the trial court sentenced applicant to death.

On November 24, 1993, this Court affirmed applicant's conviction and sentence on direct appeal.[8] One of the issues that

*Id.* (citations omitted).

5. That instruction read,
 You are instructed that you shall consider in answering the special issues any evidence which in your opinion mitigates against the imposition of the death penalty. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, record, and the circumstances of the crime, which you believe could make a death penalty inappropriate in this case.
 Further, if you believe from the evidence that the State has proven beyond a reasonable doubt that the answers to the Special Issues are "yes" but you are further p[e]rsuaded by the mitigating evidence that the defendant should not be sentenced to death in this case, then you shall answer one or both of the Special Issues "no" in order to give the effect to your belief that the death penalty should not be imposed in this case.

6. Applicant's proposed additional instruction read,
 You may use a mitigating circumstance to answer a Special Issue "no" or you may use a mitigating circumstance as a basis for leniency even if you are persuaded that all of the Special Issues must be answered "yes." If you decide that all of the Special

Issues must be answered "yes" and you also have found mitigating circumstances which call for a life sentence, you must not answer the Special Issues. Instead, to give effect to the mitigating circumstances, you must write the word "life" in each of the spaces on the verdict sheet where you would otherwise answer the Special Issues "yes" or "no." A verdict of life has the same effect as a verdict that answers at least one Special Issue "no."

7. Defense counsel explained to the trial judge,
 As the Court knows, this is a pretty new concept in our capital litigation, and it is one about which we don't have any, at this point, formal guidance from our State Court. Nevertheless, it seems to me that in a case of this kind, if we make a mistake it ought to be on the side of fully explaining mitigation, fully explaining to the Jury how they can give effect to the mitigation, if they find that it exists, and not simply, for the sake of brevity, put something in there that sounds like it might be alright, but doesn't accurately explain to the Jury what their obligation is.

8. *Hood v. State,* No. 71,167 (Tex.Crim.App. Nov. 24, 1993) (not designated for publication).

applicant raised on appeal was that the trial court erred "in failing to instruct the jury of a method to be used by them to give effect to mitigating evidence."[9] We rejected that claim, both because it was inadequately briefed and on its merits, concluding that the nullification instruction "did provide the jury with an adequate vehicle to express *and give effect* to its 'reasoned moral response'" to applicant's mitigation evidence, if any existed.[10] The United States Supreme Court denied *certiorari.*[11]

On December 22, 1997, applicant filed his first writ application under article 11.071.[12] In that application, he initially challenged the nullification instruction, but then deleted that claim from his amended application. On April 21, 1999, we denied habeas corpus relief.[13] Applicant then filed a writ application in federal court. The federal district court denied relief but granted a certificate of appealability on two grounds related to an *Ake*[14] claim. On April 2, 2004, the Fifth Circuit affirmed the district court's denial of relief in an unpublished opinion.[15] Once again, the United States Supreme Court denied *certiorari.*[16]

On May 24, 2004, applicant filed a *pro se* subsequent application for writ of habeas corpus which we dismissed as an abuse of the writ under art. 11.071, § 5.[17] That second application did not contain a claim that the nullification instruction was flawed.

On June 22, 2005, eight days before his scheduled execution, applicant filed a third writ application, alleging that the nullification instruction in applicant's case "suffered from the same constitutional defects that the Supreme Court found fatal" in *Penry II,*[18] *Smith v. Texas,*[19] and *Tennard v. Dretke.*[20] We granted applicant's motion for stay of execution and concluded that "applicant has met the requirements for consideration of a claim the basis of which was not available at the time his initial application was filed."[21] We remanded the case to the trial court for consideration of the merits of applicant's nullification instruction claim.[22]

On remand, the habeas judge[23] set out factual findings gleaned from the trial rec-

9. *Id.,* slip op. at 18.

10. *Id.,* slip op. at 20.

11. *Hood v. Texas,* 513 U.S. 834, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994).

12. Tex.Code Crim. Proc. art. 11.071.

13. *Ex parte Hood,* No. 41,168–01 (Tex.Crim. App. Apr. 21, 1999) (not designated for publication).

14. *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

15. *Hood v. Dretke,* No. 00–41272, 93 Fed. Appx. 665 (5th Cir.2004) (not designated for publication).

16. *Hood v. Dretke,* 543 U.S. 836, 125 S.Ct. 255, 160 L.Ed.2d 58 (2004).

17. *Ex parte Hood,* No. WR–41,168–02, 2005 WL 914225 (Tex.Crim.App. April 13, 2005) (not designated for publication).

18. *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

19. 543 U.S. 37, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004).

20. 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

21. *Ex parte Hood,* No. WR–41,168–03 (Tex. Crim.App. June 27, 2003) (not designated for publication).

22. *Id.*

23. The habeas judge was a Senior District Judge sitting by assignment. He was not the original trial judge.

ord and stated:

> Although opinions may vary regarding how clearly the mitigating evidence was elicited at trial and whether such evidence is overwhelming or tenuous, the record contains such evidence that a jury must, under our current law, consider regarding the imposition of the death penalty.

The trial court also entered two relevant conclusions of law: first, it concluded that applicant's "nullification" claim was unavailable at the time he filed his previous habeas application;[24] second, it concluded that the two special issues did not provide an avenue for the jury to give *full* consideration and *full* effect to applicant's mitigating evidence.[25] Although the habeas court did not apply our usual *Almanza*[26] analysis to applicant's claim of jury charge error, it recommended that we grant applicant a new punishment trial.

This Court now holds that, although we had originally determined that applicant's claim surmounted the section 5[27] bar against subsequent claims because his *Tennard* claim was unavailable at the time he filed his first two writ applications, we were wrong. The majority concludes that applicant should have known from *Penry II* that he had a viable claim concerning both the lack of a special mitigation issue and the infirmity of the jury nullification instruction. I cannot agree with this conclusion because neither the Fifth Circuit nor this Court guessed that *Penry I* and *II* broadly expanded the nature and scope of evidence that required a modification of the statutory special issues. If neither the Fifth Circuit nor this Court predicted *Tennard*, we ought not hold a death-row inmate to a higher standard of prescience or legal extrapolation.

**24.** The habeas court's first conclusion of law reads,

> Prior to the Supreme Court's decisions in *Tennard* and *Smith*, the Court of Criminal Appeals had concluded that, without a "prima facie" showing of a severe and permanent handicap, not of his own making, which is a[t] least related to the commission of the capital offense, a defendant could not pursue a claim challenging the failure of the special issues to provide a vehicle for the consideration of mitigating evidence. This standard was overturned by the Supreme Court in *Smith* which makes [it] clear that the legal basis for asserting a meritorious nullification claim was unavailable to Hood at the time he filed his previous habeas application.

**25.** The habeas court's seventh conclusion of law reads,

> The two special issues given the jury in this case do not provide an avenue for the jury to give full consideration of the mitigating evidence adduced at trial, they considered true and relevant, and then give full effect to such mitigating evidence. Thus, under the evidence in this case, to be constitution-

al, there should have been a special issue submitted to the jury that allowed the jury to give full consideration and full effect to the mitigating evidence. That special issue must allow them to answer the questions directly as the current[ ] law provides.

**26.** *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim.App.1985).

**27.** TEX.CODE CRIM. PROC. art. 11.071, § 5(a)(1). This section reads,

> If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application[.]

## II.

The threshold issue is simple to state, but difficult to decide: If *Tennard* was "new" law and recognized a constitutional claim that had not previously existed, applicant is excused from not having brought his claim before. If *Tennard* was simply a reaffirmation of existing law or could "have been reasonably formulated" from existing law,[28] then applicant is barred from raising this claim now because he could have done so in his first or second writ applications. Was applicant simply blind or negligent in failing to anticipate the reasoning or result in *Tennard?*

The State argues that applicant's claim was, at the latest, recognized by *Penry II,* if not, in fact, by *Penry I.* It argues that applicant's

> claim requires a bifurcated analysis to establish error in his case: first, he must establish that the two special issues were insufficient to encompass all of the mitigating evidence in his trial (*Penry I* error), and then he must show that the supplemental nullification instruction failed to ensure all mitigating evidence could be fully considered (*Penry II* error).[29]

Perhaps this two-pronged analysis seems obvious today, but let me take a look back at the judicial evolution that got us to the current predicament to understand why applicant might not have found this analysis intuitively obvious before the United States Supreme Court delivered *Tennard.*

### A. Penry I.

In *Penry I,* the Supreme Court held that, although the Texas capital-sentencing framework was facially valid[30] and the special issues were generally sufficient to pass constitutional muster, Johnny Paul Penry's mitigation evidence presented a special dilemma. His evidence of extreme childhood abuse and mental retardation demonstrated that he was arguably unable "to control his impulses or to evaluate the consequences of his conduct."[31] The severity of Penry's impairment suggested a relative lack of moral culpability, but because the first special issue, dealing with the "deliberateness" of his capital crime, did not contain a definition of "deliberately, in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability," this special issue did not give full mitigating effect to his evidence of mental retardation and childhood abuse.[32] Nor did the second special issue, dealing with a defendant's "continuing threat to society," adequately encompass Penry's specific evidence: although poor impulse control might be relevant in diminishing a person's moral culpability because it affected the degree to which he could and did "deliberate" upon his criminal conduct, it also magnified his dangerousness and made it more likely that he would be a continuing threat to society.[33]

---

**28.** Article 11.071, § 5(d) defines legal unavailability:

> For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was not recognized by or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.

**29.** State's Brief at 18.

**30.** *See generally Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

**31.** *Penry I,* 492 U.S. at 322, 109 S.Ct. 2934.

**32.** *Id.*

**33.** *Id.* at 323–24, 109 S.Ct. 2934.

According to the Supreme Court, Penry's evidence of childhood abuse and mental retardation was a "two-edged sword"— it diminished his moral culpability but magnified his dangerousness.[34] It was this "two-edged sword" aspect of Penry's evidence that caught the attention of Texas and federal courts. And it was the Supreme Court's emphasis in *Penry I* of judging the need for any additional mitigation instruction "on the facts of this case,"[35] that these courts focused upon in their analysis.

After *Penry I*, the pertinent inquiry was "by what principle should the line between *Penry I* and non-*Penry I* evidence be drawn?"[36] In 2003 the Fifth Circuit noted,

> Following *Penry I*, petitioners convicted in Texas have invoked that decision and requested additional instructional vehicles for many different types of mitigating evidence, including but not limited to subnormal intelligence, youth, troubled or abused childhood, intoxication, substance abuse, head injury, good character, mental illness, antisocial personality disorders, and dyslexia.[37]

Beginning immediately after *Penry I*, both this Court and the Fifth Circuit attempted to articulate a principle that would adequately and appropriately distinguish between *Penry I* and non-*Penry I* evidence. That formulation found its most succinct expression in the Fifth Circuit's 1992 *en banc* opinion in *Graham v. Collins*:[38] Was the capital crime "due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own?"[39] As the Fifth Circuit later explained,

> This formulation encompasses four principles found in *Penry I*: voluntariness, permanence, severity, and attribution. Did the defendant acquire his disability voluntarily or involuntarily? Is the disability transient or permanent? Is the disability trivial or severe? Were the criminal acts a consequence of this disability?[40]

The Fifth Circuit's formulation had not been specifically articulated or approved by the Supreme Court in *Penry I*. But the Supreme Court granted *certiorari* in the *Graham* case to address whether the Fifth Circuit was correct in concluding that Gary Graham's evidence—of youth, unstable family background, and positive character traits—was not *Penry*-type evidence that required any special mitigation instruction. The Supreme Court discussed its prior death-penalty mitigation cases and reaffirmed that the Texas scheme "permitted petitioner to place before the jury whatever mitigating evidence he could show, including his age, while focusing the jury's attention upon what that evidence revealed about the defendant's capacity for deliberation and prospects for rehabilitation."[41] The Court noted that it had just recently "rejected a claim that the Texas special issues provided an inadequate vehicle for jury consideration of evidence of a defen-

---

**34.** *Id.* at 324, 109 S.Ct. 2934.

**35.** *Id.* at 315, 109 S.Ct. 2934.

**36.** *Robertson v. Cockrell*, 325 F.3d 243, 251 (5th Cir.2003) (en banc), *cert. denied*, 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003).

**37.** *Id.* at 249–51 (footnotes collecting cases omitted).

**38.** 950 F.2d 1009 (5th Cir.1992) (en banc).

**39.** *Id.* at 1029.

**40.** *Robertson*, 325 F.3d at 251.

**41.** *Graham v. Collins*, 506 U.S. 461, 472, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993).

dant's clean prison disciplinary record."[42]

In *Graham*, the Supreme Court re-emphasized that *Penry's* holding was a narrow one that focused on the fact that Penry's evidence was a "two-edged sword."[43] The Court was explicit:

> We do not read *Penry* as effecting a sea change in this Court's view of the constitutionality of the former Texas death penalty statute; it does *not* broadly suggest the invalidity of the special issues framework. Indeed, any such reading

of *Penry* would be inconsistent with the Court's conclusion in that case that it was not announcing a "new rule" within the meaning of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).[44]

The Supreme Court noted that Graham's mitigating evidence "was not placed beyond the jury's effective reach."[45] Even if Graham's evidence, like Penry's, had significance beyond the scope of the first, "deliberateness," special issue, it

**42.** *Id.* (citing *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)).

**43.** The Fifth Circuit, in its en banc opinion in *Graham*, explained that *Penry* was a most unusual case, involving unique circumstances:

> We believe that what *Penry* represents is a set of atypical circumstances of a kind that, quite understandably, neither the Texas Court of Criminal Appeals nor the Supreme Court in *Jurek* had in mind, namely circumstances where the defense's mitigating evidence would have either no substantial relevance or only adverse relevance to the second special issue. Typically, evidence of good character, or of transitory conditions such as youth or being under some particular emotional burden at the time, will tend to indicate that the crime in question is not truly representative of what the defendant's normal behavior is or may become over time, and that the defendant may be rehabilitable so as not to be a continuing threat to society. The core of *Jurek*—which we cannot conclude has been abandoned—is that the mitigating force of this kind of evidence is adequately accounted for by the second special issue. But in *Penry* the Court was faced for the first time with a wholly different type of mitigating evidence. Not evidence of good character, but of bad character; not evidence of potential for rehabilitation, but of its absence; not evidence of a transitory condition, but of a permanent one; but *nonetheless* evidence which was strongly mitigating because these characteristics were due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own, mental retardation, organic brain damage and an abused child-

hood. There was no way this type of evidence could be given any mitigating force under the second special issue. To recognize that, as *Penry* did, is not necessarily to deny the validity of *Jurek* as it applies to the more typical case.

*Graham*, 950 F.2d at 1029–30. In its review of this Fifth Circuit opinion, the Supreme Court majority appeared to affirm the Fifth Circuit's understanding of *Penry*.

**44.** *Graham*, 506 U.S. at 474, 113 S.Ct. 892 (footnote omitted); *see also Saffle v. Parks*, 494 U.S. 484, 491, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), in which the Supreme Court stated,

> To the extent that Penry's claim was that the Texas system prevented the jury from giving any mitigating effect to the evidence of his mental retardation and abuse in childhood, the decision that the claim did not require the creation of a new rule is not surprising. *Lockett* and *Eddings* command that the State must allow the jury to give effect to mitigating evidence in making the sentencing decision; Penry's contention was that Texas barred the jury from so acting. Here, by contrast, there is no contention that *the State altogether prevented Park's jury from considering, weighing, and giving effect to all of the mitigating evidence that Parks put before them; rather, Parks' contention is that the State has unconstitutionally limited the manner in which his mitigating evidence may be considered. As we have concluded above, the former contention would come under the rule of Lockett and Eddings; the latter does not.*

*Id.* (emphasis added).

**45.** 506 U.S. at 475, 113 S.Ct. 892.

could "quite readily" have supported a negative answer to the future dangerousness question.[46] Most importantly, the Court explicitly rejected the contention that "a defendant is entitled to special instructions whenever he can offer mitigating evidence that has *some* arguable relevance beyond the special issues." [47]

The majority in *Graham* said nothing about the Fifth Circuit's distinction between *Penry* and non-*Penry* evidence, but the *Graham* dissenters did criticize the Fifth Circuit's formulation and noted that it had "limited the application of *Penry* to mitigating evidence of circumstances that were not 'transitory,' but were 'uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own.' ... *Penry* lends no support for these limitations, however, and they are plainly at odds with other controlling Eighth Amendment precedents, which the Court does not purport to disturb." [48] One might fairly conclude, then, that the majority was aware of the Fifth Circuit formulation, noted the dissenters' position, but rejected it.

Just five months after *Graham*, the Supreme Court again waded into the *Penry* vs. non-*Penry* mitigation-evidence debate and held, in *Johnson v. Texas*,[49] that the jury in Johnson's trial could consider his evidence of youthfulness under the statutory special issues without any special mitigation instruction. Once again, the Su-preme Court emphasized that *Penry* was a special case:

> We agreed that the jury instructions were too limited for the appropriate consideration of this mitigating evidence in light of *Penry's* particular circumstances. We noted that "the jury was never instructed that it could consider the evidence offered by Penry as *mitigating* evidence and that it could give mitigating effect to that evidence in imposing sentence."
>
> . . .
>
> We confirmed this limited view of *Penry* and its scope in *Graham v. Collins*. There we confronted a claim by a defendant that the Texas system had not allowed for adequate consideration of mitigating evidence concerning his youth, family background, and positive character traits. In rejecting the contention that *Penry* dictated a ruling in the defendant's favor, we stated that *Penry* did not "effect a sea change in this Court's view of the constitutionality of the former Texas death penalty statute[.]"
>
> . . .
>
> In addition, we held that Graham's case differed from *Penry* in that "Graham's evidence—*unlike* Penry's—had mitigating relevance to the second special issue concerning his likely future dangerousness." [50]

**46.** *Id.* The Supreme Court explained,
Graham's evidence of transient upbringing and otherwise nonviolent character more closely resembles Jurek's evidence of age, employment history, and familial ties than it does Penry's evidence of mental retardation and harsh physical abuse. As the dissent in *Franklin* made clear, virtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's "moral culpability" apart from its relevance to the particular concerns embodied in the Texas special issues.

*Id.* at 476, 113 S.Ct. 892.

**47.** *Id.*

**48.** *Id.* at 513, 113 S.Ct. 892 (Souter, J., dissenting, joined by Blackmun, Stevens, and O'Connor, JJ.).

**49.** 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).

**50.** *Id.* at 364–66, 113 S.Ct. 2658.

The Court concluded that "[i]t strains credulity to suppose that the jury would have viewed the evidence of petitioner's youth as outside its effective reach in answering the second special issue."[51] And, although "a juror might view the evidence of youth as aggravating, as opposed to mitigating," that fact does not mean that the Eighth Amendment is violated.[52] It was, according to the Court in *Johnson*, sufficient if the jury *could* view it as mitigating under the future-dangerousness special issue.[53]

The Supreme Court also rejected Johnson's claim that a special mitigation issue is required to allow the jury "to dispense mercy on the basis of a sympathetic response to the defendant."[54] Such a "sympathy" claim would allow a capital defendant's fate " 'to turn on the vagaries of particular jurors' emotional sensitivities' " and would violate the Court's long-held notion that capital sentencing " 'must be reliable, accurate, and nonarbitrary.' "[55] According to the *Johnson* Court, such a rule "would require that a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant,"[56] and that was not in accord with its prior decisions in *Jurek*,[57] *Lockett*,[58] and *Eddings*.[59]

Significantly, two members of the *Johnson* majority, Justices Scalia and Thomas, wrote brief concurring opinions.[60] Justice Thomas expressed satisfaction that, although he believed that *Penry* had been wrongly decided, that decision had been "substantially narrowed by later opinions."[61] Justice Scalia opined that the essence of the *Johnson* holding—"to the effect that discretion *may* be constitutionally channeled"—had been set out in his original *Penry* dissent.[62] So, after *Graham* and *Johnson*, *Penry* appeared to be less significant to some members of the

51. *Id.* at 368, 113 S.Ct. 2658. The Court explained, "The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Id.* It also distinguished *Penry*-type evidence: "Unlike Penry's mental retardation, which rendered him unable to learn from his mistakes, the ill effects of youth that a defendant may experience are subject to change and, as a result, are readily comprehended as a mitigating factor in consideration of the second special issue." *Id.* at 369, 113 S.Ct. 2658.

52. *Id.* at 368, 113 S.Ct. 2658.

53. *Id.* The Court explained that Johnson himself did not contest that his evidence of youth "could be given some effect under the second special issue." *Id.* at 369, 113 S.Ct. 2658. Rather, Johnson argued that "the future dangerousness inquiry did not allow the jury to take account of how [his youth] bore upon his personal culpability." *Id.* The Court disagreed and stated, "If any jurors believed that the transient qualities of petitioner's youth made him less culpable for the murder, there is no reasonable likelihood that those jurors would have deemed themselves foreclosed from considering and evaluating petitioner's future-dangerousness." *Id.* at 370, 113 S.Ct. 2658.

54. *Id.* at 371, 113 S.Ct. 2658.

55. *Id.* at 371–72, 113 S.Ct. 2658 (quoting *Saffle v. Parks*, 494 U.S. at 493, 110 S.Ct. 1257).

56. *Id.* at 372, 113 S.Ct. 2658.

57. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

58. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

59. *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

60. 509 U.S. at 373–74, 113 S.Ct. 2658 (Scalia, J., concurring); 509 U.S. at 374, 113 S.Ct. 2658 (Thomas, J., concurring).

61. *Id.* at 374, 113 S.Ct. 2658 (Thomas, J., concurring).

62. *Id.* (Scalia, J., concurring).

Supreme Court than it had when it was first delivered.

Once again, four members of the Supreme Court dissented, arguing that Johnson's youthfulness at the time of the capital crime bore directly on his "culpability and responsibility for the crime" and therefore could not be given *full* effect under either special issue.[63] The *Johnson* dissenters emphasized a different version of the history of mitigation evidence and Supreme Court precedent than had the majority in either *Graham* or *Johnson.*[64] It chastised the Supreme Court majority because it "clings doggedly to *Jurek* "[65] rather than requiring that a capital jury be "able to consider fully a defendant's mitigating evidence."[66]

In this case, the State implicitly suggests that applicant's nullification-instruction claim was available because of the dissenting opinions in *Graham* and *Johnson.* But article 11.071, § 5(d) refers to "a final decision" of the United States Supreme Court, not a "final dissenting opinion" of the United States Supreme Court. Further, the Fifth Circuit interpreted the majority opinions in *Graham* and *Johnson* as implicitly affirming the "voluntariness, permanence, severity, and attribution" formulation first set out in its en banc opinion in *Graham.*[67] In most of the cases following *Graham* and *Johnson,* the Texas and federal courts held that the defendants' mitigating evidence did not rise to the *Penry I* level and thus no additional mitigation instruction was necessary.[68] The presence or absence of a nullification in-

struction was therefore irrelevant. The Supreme Court denied certiorari in the vast majority of those cases. As the *en banc* Fifth Circuit noted in *Robertson,* its view of the *Graham* formulation appeared fully vindicated:

> Moreover, while it is inappropriate to ascribe undue significance to denials of certiorari, it should at least be noted that the Supreme Court has been loathe to disturb this court's interpretation of *Penry I.* In the decade from the en banc decision in *Graham* (January 3, 1992) to the end of 2002, numerous petitioners asked this court to overturn their capital sentences on the basis of *Penry*-evidence claims. Of the 47 cases we addressed on the merits, this court applied the *Graham* interpretation of *Penry I* in each and concluded that only one of these petitioners, Michael Blue, had mustered evidence with a mitigating thrust beyond the special issues. Of the remaining 46 petitioners, 42 petitioned the Supreme Court for writ of certiorari. The Court dismissed the writ in one of them, remanded the instant case for reconsideration in light of *Penry II* and one other on separate grounds, and denied the petitions in the remaining 39. Furthermore, in 14 of these 39 cases petitioners alleged child abuse. A sizable number of these 14 present factual allegations that are quite similar to Robertson's. Certiorari was denied in all of those cases. In light of the Supreme Court's consistent denial of *Penry*-based petitions, it would be unwarranted for us

**63.** *Id.* at 376, 379, 113 S.Ct. 2658 (O'Connor, J., dissenting, joined by Blackmun, Stevens, and Souter, JJ.).

**64.** *Id.* at 379–86, 113 S.Ct. 2658.

**65.** *Id.* at 382, 385, 113 S.Ct. 2658.

**66.** *Id.* at 386, 113 S.Ct. 2658.

**67.** *See Tennard v. Dretke,* 442 F.3d 240, 251–52 (5th Cir.2006) (noting that the Supreme Court had affirmed the Fifth Circuit's holding in *Graham* and "seemed to endorse the en banc majority's understanding of *Penry I* ").

**68.** *See Robertson,* 325 F.3d at 249–51 & nn. 5–14 (collecting cases).

to abandon our established precedent under the *Graham* framework.[69]

If ever there were a case and reasoning that cried out for rectification if rectification were necessary, *Robertson* was it. But the Supreme Court denied *certiorari* and denied Robertson's request for a stay of execution.[70]

A year later, in April 2004, this Court followed the Fifth Circuit's *en banc* reasoning in *Robertson* and held, in *Ex parte Smith*,[71] that the defendant's mitigating evidence of youth, a somewhat limited mental capacity, and a difficult family background could all be adequately addressed under the two statutory special issues.[72]

The very next month, applicant filed his second, *pro se*, habeas application. Surely the majority opinions in *Graham, Johnson, Robertson,* or *Smith* would not have put him on notice of the availability of his current claim that the two special issues were inadequate to address his evidence of his youth, physical disabilities stemming from the septic-tank truck accident when he was three, a speech impediment, and low scholastic achievements.[73] As the Fifth Circuit noted in *Robertson,* an unbroken line of cases, from the Supreme Court, the Fifth Circuit, and this Court, had uniformly distinguished *Penry I* and rejected claims of this nature over a period of fifteen years.

Then, precisely one month after applicant filed his *pro se* application, the Supreme Court delivered its opinion in *Tennard v. Dretke*.[74] It repudiated the Fifth Circuit's 1992 *Graham* formulation and all of the Fifth Circuit cases that had relied upon that formulation. It stated, "The Fifth Circuit's test has no foundation in the decisions of this Court. Neither *Penry I* nor its progeny screened mitigating evidence for 'constitutional relevance' before considering whether the jury instructions comported with the Eighth Amendment."[75] Instead, the Fifth Circuit's *Graham* "constitutional relevance" formulation essentially precluded defendants from successfully arguing that the future-dangerousness special issue provided an insufficient vehicle for giving effect to mitigating evidence which was not severe, permanent, or related in some way to the commission of the capital crime.[76] A new

---

69. 325 F.3d at 256–57 (citations and footnotes omitted).

70. *Robertson v. Cockrell,* 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003). Only Justices Stevens and Ginsburg would have granted the application for a stay of execution. *Id.* Our Court later granted Robertson a stay of execution and remanded the case to the trial court for consideration of his post-*Tennard* claim.

71. 132 S.W.3d 407 (Tex.Crim.App.2004).

72. *Id.* at 415–16 (to make out a *Penry I* violation, "a defendant first must make a *prima facie* showing of a severe and permanent handicap, not of his own making, which is at least related to the commission of the capital offense. Second, the defendant must show that this disability evidence was effectively beyond the reach of the two special issues. Applicant has made neither showing. We

conclude that the two special issues provided applicant's jury with a constitutionally sufficient vehicle to give effect to his mitigating evidence.") (footnote omitted).

73. Applicant has included additional assertions of mitigation evidence in his subsequent writ, but we are bound by the evidence actually adduced at trial in deciding whether he was entitled to any special mitigation instructions at that trial.

74. 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

75. *Id.* at 284, 124 S.Ct. 2562.

76. *Id.* at 284–88, 124 S.Ct. 2562. One might notice that the four dissenters in *Graham* had made precisely this argument, but the *Graham* majority declined to address it. Perhaps

majority of the Supreme Court held that the Eighth Amendment requires that a jury be able to consider and give effect to *any* relevant evidence that one could consider mitigating and might serve as a basis for a sentence less than death.[77] Although it did not expressly say so, the Court implied that if a defendant offers evidence that some juror might consider mitigating, then, unless the jury could give it *full* consideration under the statutory special issues, the trial judge commits constitutional error if it does not provide a special mitigation vehicle.[78]

Five months later, in November of 2004, the Supreme Court, in a *per curiam* opinion and without full briefing or oral argument, reversed our decision in *Ex parte Smith*.[79] The Court noted that we had

delivered *Smith* shortly before the Supreme Court decided *Tennard* and that we had relied upon prior Fifth Circuit precedent. The Supreme Court held that its recent decision in *Tennard* controlled the outcome in *Smith*.[80] The Court stated, "Because petitioner's proffered evidence was relevant, the Eighth Amendment required the trial court to empower the jury with a vehicle capable of giving effect to that evidence."[81] And the Court concluded that the nullification instruction given in Smith's trial was an insufficient vehicle for the jury to *fully* consider and give *full* effect to his mitigation evidence.[82]

The Supreme Court's decisions in *Tennard* and *Smith* form the basis of applicant's current claim.[83] I cannot fault applicant for failing to have predicted them.

---

there is some significance to the fact that Justice White, who wrote the majority opinion in *Graham*, and Justice Blackmun, who dissented in *Graham*, retired and were replaced by Justices Ginsburg and Breyer by the time *Tennard* was delivered.

77. *See id.* at 287, 124 S.Ct. 2562.

78. *See generally id.* at 282–88, 124 S.Ct. 2562.

79. *Smith v. Texas*, 543 U.S. 37, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004).

80. *Id.* at 43, 125 S.Ct. 400 (stating, "Our rejection of that ["constitutionally relevant" mitigating evidence] threshold test was central to our decision to reverse in *Tennard*").

81. *Id.* at 45, 125 S.Ct. 400.

82. *Id.* at 46, 125 S.Ct. 400.

83. In his subsequent application, applicant argues that prior to the decisions in *Tennard* and *Smith*, "this Court had repeatedly concluded that, without a '*prima facie* showing of a severe and permanent handicap, not of his own making, which is at least related to the commission of the capital offense,' a defendant could not pursue a claim challenging the failure of the special issues to provide a vehicle for the consideration of mitigating evidence." Application at 16. Applicant, how-

ever, cites only a single case, *Ex parte Smith*, 132 S.W.3d at 415, for that proposition. In fact, *Ex parte Smith* would appear to be the only published Texas case that had explicitly used the Fifth Circuit screening test for constitutional relevance, although numerous Texas cases had previously required a "nexus between the mitigating evidence and culpability for the crime," and/or permanence of any handicap. *Lackey v. State*, 819 S.W.2d 111, 135, n. 10 (Tex.Crim.App.1989) (op. on reh'g); *see also Nobles v. State*, 843 S.W.2d 503, 506 (Tex.Crim.App.1992) ("Evidence of the appellant's unfortunate childhood was not, without some testimony indicating a nexus between his childhood circumstances and the commission of the crime, helpful to the jury's consideration of the special issues or indicative of a lessened moral blameworthiness. In fact, the evidence appellant chose to present tends to show that the abuse appellant received was sporadic and isolated, not of a continuing nature. Indeed, testimony revealed that attempts were made to place appellant in a safe and nurturing environment once evidence of his less than model home-life became apparent. As such, the evidence he offered was sufficiently encompassed within the scope of the special issues and no special jury charge was required"); *Goss v. State*, 826 S.W.2d 162, 165 (Tex.Crim.App.1992) ("the evidence must tend to excuse or explain the criminal act, so as to make that particular defendant not deserving of death").

## B. *Penry II.*

The corollary to *Penry I*, that some mitigating evidence may be outside the ambit of the two special issues, is that there must be a vehicle that permits the jury to sufficiently consider and give effect to that evidence. That issue was addressed in the 2001 Supreme Court decision in *Penry II*. In that case, the Court held that the non-statutory nullification instruction—devised after *Penry I* as a stop-gap measure until the Texas Legislature could convene and enact a statutory special mitigation issue—was unconstitutional as applied to Penry and his evidence of childhood abuse and mental retardation.[84]

In *Penry II*, the Supreme Court stated that the jury might view the nullification instruction in either of two ways: First, it could "be understood as telling the jurors to take Penry's mitigating evidence into account in determining their truthful answers to each special issue."[85] But this would not alleviate the problem of *Penry I* in which a defendant's mitigating evidence was outside the ambit of the special issues.[86] Second, it could be understood "as informing the jury that it could 'simply answer one of the special issues "no" if it believed that mitigating circumstances made a life sentence ... appropriate ... regardless of its initial answers to the questions.' "[87] Again, this would not alleviate the problem of *Penry I* because "it made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation."[88] That is, "jurors who wanted to answer one of the special issues falsely to effect to the mitigating evidence would have had to violate their oath to render a 'true verdict.' "[89]

Thus, in a *Penry I* situation—one in which the defendant's mitigating evidence was a "two-edged" sword, pointing both to a decreased moral culpability but an increased risk of dangerousness—the nullification instruction given in *Penry II* was insufficient to allow the jury to give effect to that evidence. The Supreme Court, in *Penry II*, did not speak to other types of mitigating evidence—*i.e.*, mitigating evidence that was not double-edged. On the other hand, numerous pre-*Penry* cases decided by the Supreme Court had stated that the Texas special issues were a sufficient vehicle to give effect to mitigating evidence.[90] *Penry II* did not appear, on its face, to disturb that jurisprudence.

It was not until *Tennard* and *Smith* that the Supreme Court suggested that (1) any and all "relevant" evidence offered by a defendant that could be considered as mitigating his moral culpability requires a special mitigation issue;[91] and (2) a nullifica-

---

84. 532 U.S. at 798–800, 121 S.Ct. 1910.

85. *Id.* at 798, 121 S.Ct. 1910.

86. *Id.*

87. *Id.*

88. *Id.* at 799, 121 S.Ct. 1910.

89. *Id.* at 800, 121 S.Ct. 1910.

90. *See, e.g., Jurek, Franklin, Graham,* and *Johnson.*

91. Indeed, the Supreme Court said in both *Graham* and *Johnson* that

[h]olding that a defendant is entitled to special instructions whenever he can offer mitigating evidence that has *some* arguable relevance beyond the special issues ... would be to require in all cases that a fourth "special issue" be put to the jury: " 'Does any mitigating evidence before you, whether or not relevant to the above [three] questions, lead you to believe that the death penalty should not be imposed?' "

*Johnson,* 509 U.S. at 372, 113 S.Ct. 2658 (quoting *Graham,* 506 U.S. at 476, 113 S.Ct. 892, which quoted *Franklin,* 487 U.S. at 180 n. 10, 108 S.Ct. 2320). The Court rejected such a notion, observing, "The first casualty of [such] a holding ... would be *Jurek.* The

tion instruction is always unconstitutional. Of course, neither *Tennard* nor *Smith* explicitly stated these two propositions, they merely hinted at them. Thus, federal and Texas courts are still floundering in the stormy seas of what constitutes "relevant" mitigation evidence and what instructions will (and will not) provide an adequate vehicle for a jury's consideration of that evidence. I join those members of the Fifth Circuit who recently lamented that the Supreme Court has still not given the lower courts clear and adequate guidance in the area of mitigation evidence and jury instructions in death penalty cases:

> The [Supreme] Court's continuing mixed signals on issues of critical importance to Texas's criminal justice system are unfortunate. It is to be hoped that, for the sake of certainty, the Court will clarify its jurisprudence in the cases on which it just granted certiorari.[92]

The profound problem with the current uncertainty is that clarity of the law in this *Penry I* and *Penry II* area is a matter of life and death to all of those inmates sentenced to death prior to the 1991 Texas legislation enacting a statutory mitigation issue. Many, if not most, of those inmates filed for certiorari review in the Supreme Court, but their writs were denied, and they were duly executed. As Chief Judge Jones lamented,

> Sadly, for the State of Texas, for certainty and *stare decisis*, and for defendants who deserve to know their fate before the last minute, we seem no fur-

ther along in understanding the [Supreme] Court's pronouncements today than we were fifteen years ago when we reheard *Graham* en banc.[93]

Like many members of the Fifth Circuit, I am thoroughly confused by the Supreme Court's recent decisions in *Tennard* and *Smith*.

## C. The Dilemma that *Tennard* and *Smith* created for Texas Courts

A clear understanding of those two recent decisions, and the resolution of the question of whether those decisions announced "new law" that was previously unavailable is crucial to this applicant and all other applicants similarly situated. Under our Texas habeas corpus statute, an applicant may not have the merits of a subsequent writ considered unless he passes over the threshold of article 11.071, § 5. Thus, if *Tennard* and *Smith* announced new law, we may consider the merits of applicant's claims. If they are mere clarifications of existing and previously available law, we are statutorily required to dismiss his subsequent application as an abuse of the writ.[94]

On the other hand, federal courts are not permitted to grant a state petitioner's writ application complaining about a state-court decision unless the state court's determination of the legal issue was an unreasonable application of clearly established law as announced by the Supreme Court.[95] In other words, this Court may address applicant's claim only if *Tennard*

---

inevitable consequence of petitioner's argument is that the Texas special issues system in almost every case would have to be supplemented by a further instruction." *Id.*

**92.** *Nelson v. Quarterman*, 472 F.3d 287, 337–38, (5th Cir.2006) (en banc) (Jones, C.J., dissenting, joined by Jolly, Smith, Barksdale, Garza, and Clement, JJ.).

**93.** *Id.* at 345.

**94.** Tex.Code Crim. Proc. art. 11.071, § 5.

**95.** 28 U.S.C. § 2254(d)(1). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), "a federal court may not grant a writ of habeas corpus 'with respect to any claim that was adjudicated on the merits in State court proceedings' unless the petitioner shows that the state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly estab-

and *Smith* are newly available legal claims, whereas federal courts may grant petitioner's claim only if this Court has misapplied clearly established federal law. This is all very awkward. To grant a Texas death-row inmate relief on his subsequent *Penry I* and *Penry II* claim under the recently decided *Tennard* and *Smith* cases, we must find that those decisions announced new law, but the federal courts cannot grant relief on those very same claims unless they find that Texas courts misapplied clearly established law at the time of the relevant state-court decision.[96] Hence, a death-row inmate must argue in this Court that *Tennard* and *Smith* announced new law, but he must argue that *Tennard* and *Smith* simply reiterated clearly established law once he arrives in federal court. I can think of no way in which *Tennard* and *Smith* can simultaneously be both "newly available law" for state court purposes and "clearly established law" for federal court purposes. Only the Supreme

Court can tell the federal and state courts which one it is: new law or clearly established law. And only the Supreme Court can tell both federal and state courts whether *Jurek, Franklin, Graham,* and *Johnson* have been overruled by *Tennard* and *Smith,* or whether all of these cases are reconcilable (and if so, how). I join those members of Fifth Circuit who hope that the Supreme Court will resolve our dilemma and clarify its current mitigation evidence and instructions jurisprudence.[97]

Until then, I agree with applicant that *Tennard* and *Smith* constitute newly available law and that he is entitled to have the merits of his application addressed by this Court. I respectfully dissent to the majority's decision to dismiss his subsequent application under article 11.071, § 5, as an abuse of the writ.[98]

---

lished Federal law, as determined by the Supreme Court of the United States,' or that the state court's adjudication of a claim 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' " *Nelson,* 472 F.3d at 292; *see Brown v. Payton,* 544 U.S. 133, 141–43, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005) (concluding that 9th Circuit erred in granting relief; holding that, under AEDPA, "[e]ven on the assumption that [the California Supreme Court's] conclusion was incorrect, it was not unreasonable, and is therefore just the type of decision that AEDPA shields on habeas review"); *Williams v. Taylor,* 529 U.S. 362, 406, 409, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable"; holding that "clearly established Federal law" means "the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision," and explaining that a state-court decision is contrary to the Supreme Court's "clearly established precedent

if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent").

96. *See, e.g., Nelson,* 472 F.3d at 303 (concluding that *Tennard* and *Smith* merely reaffirmed clearly established law that existed in 1994, at the time Nelson's conviction became final).

97. *See id.,* 472 F.3d at 337–38 (Jones, C.J., dissenting, joined by Jolly, Smith, Barksdale, Garza, and Clement, JJ.); *see also id.* at 348, 350–51 (Smith, J., dissenting) (noting "the embarrassing procedural tangle caused by the various actions of the Supreme Court and this court in *Penry*-related cases" and concluding, "The Court's willingness to address *Penry* questions once again is welcome. Perhaps the High Court will issue a tongue-lashing like the one Justice O'Connor penned in *Tennard.* If so, it will be despite this court's honest attempts to apply the Court's sundry pronouncements.").

98. However, I certainly cannot fault the majority for following what a majority of the

members of the Fifth Circuit so recently announced in *Nelson v. Quarterman,* in concluding that the tenets of *Penry I* and *Penry II* were clearly established federal law by 1994 even though *Penry II* was not delivered until 2001.